CHARLES B. PERKINS  #126942
FLYNN, ROSE & PERKINS
59 North Santa Cruz Avenue, Suite Q
Los Gatos, California 95030
(408) 399-4566
(408) 399-6683 facsimile
E-mail: cbperk@earthlink.net

ANN K. SULLIVAN, Virginia Bar No. 17762
(*pro hac vice* application to be submitted)
MELISSA M. PICCO, Virginia Bar No. 23510
(*pro hac vice* application to be submitted)
CRENSHAW, WARE & MARTIN, P.L.C.
1200 Bank of America Center
Norfolk, VA 23510
(757) 623-3000
(757) 623-5735 facsimile
E-mail: asullivan@cwm-law.com

Attorneys for Plaintiff
PEGGY L. HAWKES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

PEGGY L. HAWKES,

                    Plaintiff,

vs.

HEWLETT-PACKARD COMPANY,

                    Defendant.

Case No.  CV 10- 05957  JW

COMPLAINT
(42 U.S.C. § 2000(e) et seq., 29 U.S.C. §621, et seq.)
And DEMAND FOR JURY TRIAL

Plaintiff alleges:

## NATURE OF CLAIM, JURISDICTION AND VENUE

      1.     This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq. ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. ("ADEA").

2.     This Court has jurisdiction of Ms. Hawkes' federal law claims pursuant to 28 U.S.C. § 1331 and 42 USC § 2000e-5.

3.     Venue is properly laid in this District pursuant to 42 U.S.C. 2000e-5(f)(3) and 28 U.S.C. § 1391(b).  Defendant is headquartered in Palo Alto, California and thus is a resident of this judicial district.  See 28 U.S.C. 1391(b).  Upon information and belief, the employment records relevant to the unlawful employment practice at issue are maintained and administered in HP's headquarters in this judicial district.  See 42 U.S.C. 2000e-5(f)(3).

4.     Ms. Hawkes has satisfied all procedural prerequisites for filing of her claims.  Ms. Hawkes filed a Charge of Discrimination against HP for the unlawful employment practices set forth herein with the U.S. Equal Employment Opportunity Commission and did so within the required time limits specified by law and regulation.  Ms. Hawkes instituted this action within ninety days of receipt of the EEOC Dismissal and Notice of Rights letter.

### PARTIES TO THIS ACTION

5.     Ms. Hawkes is a citizen of the United States and a resident of the Commonwealth of Virginia.  At all relevant times, Ms. Hawkes was employed by HP as a Enterprise Account Manager and worked out of her home office in Virginia Beach, Virginia as a telecommuter until her employment was involuntarily terminated in October, 2007.  Ms. Hawkes is a 59 year old, white female; at the time of her termination, she was 56.

6.     Defendant HP a corporation incorporated in Delaware with its corporate headquarters located in the Palo Alto, California.

7.     Ms. Hawkes is an "employee" as that term is defined in Title VII and the ADEA.

8.     HP is an "employer" as that term is defined in Title VII and the ADEA.

### FACTUAL ALLEGATIONS

9.     Ms. Hawkes became an employee of HP in 2002 when her employer at the time, Compaq Computer Company ("Compaq") merged with HP.  Ms. Hawkes had become an employee of Compaq in January 1998 when Compaq purchased her previous employer, Digital Equipment Corporation ("Digital").  Ms. Hawkes was initially hired by Digital on March 19, 1984. She left Digital in 1995, but returned on September 29, 1997 and remained an employee of Digital

COMPLAINT; DEMAND FOR JURY TRIAL

1     through its acquisition by Compaq.

2     10.     Ms. Hawkes worked for HP as an Enterprise Account Manager (EAM) in HP's US

3 Enterprise Sales-Mid Atlantic Technology Solutions Group since approximately 2002. Ms.

4 Hawkes received numerous awards for her performance and promotions during her employment

5 with Digital, Compaq and HP, including a promotion in 2006 to the position of EAM IV, the

6 position in which she was employed at the time of her termination. She likewise received positive

7 evaluations during her employment and met and exceeded productively goals. Ms. Hawkes never

8 received nor was advised of any complaints regarding her productivity or performance. She was

9 never given any feedback or coaching, nor issued any Performance Warnings or probation, as is

10 required under HP's Global Corrective Action Policy for employees exhibiting performance

11 problems.

12     11.     As an EAM IV, Ms. Hawkes was under the supervision of Mr. Charles Bucknor,

13 HP's Manager for its US Enterprise Sales-Mid Atlantic 1H08 Technology Solutions Group.

14     12.     While Ms. Hawkes worked under Mr. Bucknor's supervision, Mr. Bucknor

15 intentionally and systematically transferred Ms. Hawkes to low performance accounts, which made

16 it impossible to achieve her yearly quota. Despite this, Ms. Hawkes still managed to achieve one

17 of the highest percentages of sales quota amongst the EAMs in her group.

18     13.     Despite her superior performance, HP terminated Ms. Hawkes in October 2007.

19 Ms. Hawkes was advised of her termination by an email from Mr. Bucknor stating that she was to

20 be subject to the HP Workforce Reduction Plan. Ms. Hawkes was advised by Mr. Bucknor that

21 she was included in the Plan because her position was "no longer necessary."

22     14.     Ms. Hawkes received no advance notification that she was being terminated, and

23 was not provided any opportunity to renegotiate account assignments. Other younger, male

24 employees were provided such advance notification, including details of the impending workforce

25 reduction and sales reorganization, and were given the opportunity to renegotiate account

26 assignments. The failure to notify Ms. Hawkes impaired her ability to find another position within

27 HP.

28     15.     Other similarly situated male employees who were younger than Ms. Hawkes and

COMPLAINT; DEMAND FOR JURY TRIAL

who were performing at a lower level were not terminated and remained as EAMs under Mr. Bucknor.  A male EAM who was terminated was placed in another position with HP within one week, as a result of assistance by Mr. Bucknor.  Neither Ms. Hawkes nor another female EAM were provided assistance by Mr. Bucknor nor offered another position with HP.

16.     Prior to her departure, HP advertised the position of EAM IV with job grade S9H, the position that Ms. Hawkes held, as "open."  Three of the accounts she managed were assigned to this position.  The hiring manager referenced on this positing was Mr. Bucknor.  Thus, Mr. Bucknor's explanation to Ms. Hawkes at the time of her termination that her position "was not necessary" was untrue and a pretext for discrimination.

17.     On November 19, 2007, Ms. Hawkes by her counsel notified Ms. Suzanne Guzman, HP Human Resources Support Specialist, of her concerns relating to age and gender discrimination associated with the decision to terminate her employment.  This communication was made during the period of the redeployment phase of the Workforce Reduction Plan and the period of priority consideration for reemployment.  No response was made.  Upon information and belief, no investigation was conducted.  HP was aware of Bucknor's discriminatory animus toward women and had counseled him regarding his discriminatory practices prior to receiving Ms. Hawkes' complaint.

18.     After raising the issues regarding discrimination, Ms. Hawkes applied for the position of EAM IV with job grade S9H in Mr. Bucknor's group.  She contacted Mr. Bucknor and alerted him, as the hiring manager that she had applied for the position.  Ms. Hawkes was never contacted nor interviewed for this position.  She requested assistance from Mr. Bucknor in obtaining a new position with HP.  Mr. Bucknor refused to assist her, although he assisted other male employees in finding new employment.  When Mr. Bucknor refused to assist her and Ms. Hawkes expressed her dismay, he told her to "get over it."

19.     HP ultimately filled this position with Mr. Rob Lavis, a younger male from a technical sales support group who had no experience as an Enterprise Account Manager.

20.     After her departure, two of the accounts previously assigned to Ms. Hawkes were re-assigned to a younger male, Mr. Doug Hamilton.

COMPLAINT; DEMAND FOR JURY TRIAL

21.     In total, Ms. Hawkes applied for approximately 13 positions with HP during the redeployment phase of the Workforce Reduction Plan for which she was qualified. Pursuant to the HP Workforce Reduction Plan, Ms. Hawkes was to be given priority consideration in seeking other jobs with HP. After raising the issues regarding potential discriminatory animus underlying her termination, and despite her priority status, Ms. Hawkes was never contacted, interviewed for or offered employment in any of these positions. Upon information, some of these positions were filled with less-qualified, younger and/or male individuals.

22.     HP acted with discriminatory animus in terminating Ms. Hawkes' employment and in failing to re-hire her, and subjected Ms. Hawkes to retaliation in response to her claims of discrimination on the basis of gender and age, in further violation of Title VII and the ADEA.

23.     HP engaged in intentional discrimination with malice and reckless indifference to the federally protected rights of Ms. Hawkes.

24.     HP asserted for the first time in the EEOC proceedings that Ms. Hawkes was terminated for performance issues and customer dissatisfaction. HP's assertion is not borne out by the facts and is thus pretextual. Ms. Hawkes superior performance was recognized through written evaluations, multiple sales awards and promotions she received during her employment with HP. Ms. Hawkes achieved one of the highest percentages of sales quota amongst the EAMS in her group and achieved a greater percentage of her quota than other, male and younger EAMs reporting to Mr. Bucknor who were not terminated. HP did not provide any feedback or coaching, nor issue any Performance Warnings or probation to Ms. Hawkes, as is required of it under the Global Corrective Action Policy for any employees with performance issues or complaints, and thus HP violated its own Policy when it fired Ms. Hawkes.

25.     Ms. Hawkes timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on March 12, 2008.

26.     The EEOC issued a Dismissal and Notice of Rights letter dated October 1, 2010.

27.     This Complaint is filed within 90 days of Ms. Hawkes' receipt of the EEOC Dismissal and Notice of Rights letter.

28.     As part of HP's Workforce Reduction Plan, Ms. Hawkes was offered a cash

COMPLAINT; DEMAND FOR JURY TRIAL

1    severance payment for her "Years of Full-Time Equivalent Service," defined as "each 12 month

2    period of service during which an Employee is in full-time active pay status on the U.S. payroll of

3    HP and its affiliates."   See Workforce Reduction Plan, Exhibit 1, ¶6.   Based upon Ms. Hawkes'

4    "Years of Full-time Equivalent Service" with HP, she was entitled to substantial severance benefits

5    under the Plan.   However, HP conditioned receipt of the cash severance payment upon Ms.

6    Hawkes signing a release of all claims, actions and causes of action, including those relating to

7    employment discrimination or harassment based on sex and age.   See Waiver and General Release

8    Agreement, attached hereto as Exhibit 2.   Thus, as a result of HP's unlawful discrimination and

9    retaliation, which Ms. Hawkes refused to waive and release, Ms. Hawkes was denied the severance

10   benefits to which she was entitled pursuant to the Workforce Reduction Plan.

11                                          COUNT I
                              (Unlawful Sex Discrimination And Retaliation)
12        29.     Ms. Hawkes incorporates and relies upon the averments stated in the previous

13   paragraphs as if same were fully restated in Count I.

14        30.     HP terminated and failed to re-hire Ms. Hawkes because of her gender (female).

15        31.     Ms. Hawkes has suffered disparate treatment based on her gender (female) in the

16   terms, conditions and privileges of her employment in violation of Title VII of the Civil Rights Act

17   of 1964, as amended by the Civil Rights Act of 1991.

18        32.     HP's stated reason for Ms. Hawkes' termination and failure to re-hire is a pretext

19   for unlawful discrimination.

20        33.     HP acted intentionally and with malice or reckless disregard for Ms. Hawkes' right

21   not to be discriminated against on the basis of her gender.

22        34.     Ms. Hawkes' conduct in complaining about the selectively favorable treatment of

23   employees was protected "opposition" conduct pursuant to Title VII.   HP retaliated against Ms.

24   Hawkes for her exercise of Title VII rights, in further violation of Title VII.

25        35.     As a direct and proximate result of HP's actions, Ms. Hawkes has suffered and

26   continues to suffer and will in the future suffer injury and damages, including embarrassment,

27   inconvenience, humiliation, severe mental anguish, emotional pain and suffering, loss of income,

28   litigation expense including attorneys' fees, consequential damage and other injury.

COMPLAINT; DEMAND FOR JURY TRIAL

COUNT II
(Unlawful Age Discrimination And Retaliation)

36.     Ms. Hawkes incorporates and relies upon the averments stated in the previous paragraphs as if same were fully restated in Count II.

37.     HP terminated and failed to re-hire Ms. Hawkes because of her age.

38.     Ms. Hawkes has suffered disparate treatment based on her age in the terms, conditions and privileges of her employment in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, et seq.

39.     HP's stated reason for Ms. Hawkes' termination and failure to re-hire is a pretext for unlawful discrimination.

40.     HP acted intentionally and with malice or reckless disregard for Ms. Hawkes' right not to be discriminated against on the basis of her age.

41.     Ms. Hawkes' conduct in complaining about the selectively favorable treatment of employees was protected "opposition" conduct pursuant to the ADEA.  HP retaliated against Ms. Hawkes for her exercise of her ADEA rights, in further violation of the ADEA.

42.     As a direct and proximate result of HP's actions, Ms. Hawkes has suffered and continues to suffer and will in the future suffer injury and damages, including embarrassment, inconvenience, humiliation, severe mental anguish, emotional pain and suffering, loss of income, litigation expense including attorneys' fees, consequential damage and other injury

WHEREFORE, Plaintiff requests judgment against HP as follows:

(1)     For appropriate declaratory relief declaring the acts and practices of HP violative of the ADEA and Title VII.

(2)     For appropriate compensatory damages against HP for violations of Count I and Count II, to include for lost wages including back and front pay and benefits, lost cash severance payment and for emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life, and any other non-pecuniary losses.

(3)     For appropriate punitive damages against HP for violations of Count I and Count II.

(4)     For reinstatement to her former position or another position for which Plaintiff is suited without loss of seniority.

COMPLAINT; DEMAND FOR JURY TRIAL

1    (5)    For appropriate equitable relief including retroactive relief for lost back pay and

2    benefits, pre and post judgment interest, prospective relief for the value of reinstatement (front pay

3    in lieu of reinstatement) and the enjoining and permanent restraining of these violations and

4    direction to HP to take such affirmative action as is necessary to insure that the effects of the

5    unlawful practices are eliminated and do not continue to affect Ms. Hawkes' employment

6    opportunities.

7    (6)    For an award of reasonable attorneys fees and costs, including expert witness fees

8    and costs of this action.

9    (7)    For an award of pre-judgment and post-judgment interest.

10    (8)    And for such additional legal and equitable relief as the Court deems appropriate.

11    DATE: December 29, 2010               FLYNN, ROSE & PERKINS

12                                          By _____

13                                          CHARLES B. PERKINS
                                            FLYNN, ROSE AND PERKINS
14                                          ANN K. SULLIVAN
                                            (*pro hac vice application to be submitted*)
15                                          MELISSA M. PICCO
                                            (*pro hac vice application to be submitted*)
16                                          CRENSHAW, WARE & MARTIN, P.L.C.
                                            Attorneys for Plaintiff
17                                          PEGGY L. HAWKES

18

19                          DEMAND FOR JURY TRIAL

20

21    Plaintiff hereby demands a trial by jury.

22    DATE: December 29, 2010               By _____

23                                          CHARLES B. PERKINS
                                            FLYNN, ROSE AND PERKINS
24                                          ANN K. SULLIVAN
                                            (*pro hac vice application to be submitted*)
25                                          MELISSA M. PICCO
                                            (*pro hac vice application to be submitted*)
26                                          CRENSHAW, WARE & MARTIN, P.L.C.
                                            Attorneys for Plaintiff
27                                          PEGGY L. HAWKES

28

COMPLAINT; DEMAND FOR JURY TRIAL

EXHIBIT

tabbies

|

EXECUTION COPY

THE HEWLETT-PACKARD COMPANY

WORKFORCE REDUCTION PLAN

.Amended and Restated

Effective as of September 1, 2007

2588639

"Plan" means The Hewlett-Packard Company Workforce Reduction Plan, as amended and restated, effective September 1, 2007, and as may be amended from time to time.

"Plan Year" means the calendar year.

"Redeployment Program" means HP program described in Sections 3(a) and 4(a) below.

"Redeployment Period" means the four-week period designated in writing by HP during which a Designated Employee participates in a Redeployment Program.

"Release" means a writing signed by the Participant in the form prescribed by HP, in which the Participant releases any and all claims it might have against HP, its affiliates and agents. A Release shall be effective after the revocation period, so long as the Participant does not revoke the release during that period.

"Salary Continuation Pay" means the cash benefits payable to a Participant during the Salary Continuation Pay Period.

"Termination Date" means the date specified by HP that an individual ceases to be an Employee of HP and its affiliates.

"WARN Act" means, collectively, the Federal Worker Adjustment and Retraining Notification Act and, to the extent applicable, similar law(s) of any jurisdiction.

"Weekly Base Pay" means the earnings an Employee receives, or would receive, for a calendar week if the individual worked a standard work week not exceeding 40 hours, exclusive of bonus, overtime pay, gap pay, shift differential, weekend premium or any other additional compensation. For an Employee paid on an incentive or other sales related basis, "Weekly Base Pay" means the weekly earnings determined with reference to the on-target earnings established for that Employee. Weekly Base Pay shall be determined as of a Participant's Termination Date by HP.

"Weekly Pay" means the earnings an Employee receives, or would receive, for a calendar week if individual worked a standard work week not exceeding 40 hours, including gap pay, weekend premium and shift differential and excluding bonus, overtime pay, or any other additional compensation. For an Employee paid on an incentive or other sales related basis, "Weekly Pay" means the weekly earnings determined with reference to the on-target earnings established for that Employee. Weekly Pay shall be determined as of the last business day immediately preceding the Participant's Job Search/Salary Continuation Period. Weekly Pay will be adjusted, as of the effective date of the approved salary increase, to reflect any approved salary increase that becomes effective during the Job Search/Salary Continuation Period.

"Year(s) of Full-Time Equivalent Service" means each 12-month period of service during which an Employee is in full-time active pay status on the U.S. payroll of HP and its affiliates. In the case of an Employee employed in less than full-time status, "Years of Full-Time Equivalent Service" shall mean such longer period of service required to aggregate 2088 standard hours. "Years of Full-Time Equivalent Service" shall be determined in one-tenth year increments. Such Service shall include, without limitation, paid time off, flexible time off, vacation, jury duty, holidays, bereavement leave, and military leaves of absence; and such Service shall not include, for example, personal or medical leaves of absence.

In the case of a Participant rehired by HP or its affiliates after his or her employment terminated through a workforce reduction program under which he or she received severance benefits in accordance with this Plan, any predecessor plan or any similar program or arrangement that provided for severance benefits (including, without limitation, plans of acquired companies to the extent service with such acquired companies would otherwise be included for purposes of calculating Service), "Year(s) of Full-Time Equivalent Service" shall be calculated based on the Participant's most recent hire date, as determined by HP.

2

"Year(s) of Full-Time Equivalent Service" shall not include any period of time during which a Participant was not an Employee. In addition, service with an employer prior to the date an organization is acquired by HP (including through a merger, acquisition, asset purchase, outsourcing, joint venture, or any other form of business combination) shall not be included in "Year(s) of Full-Time Equivalent Service" for any purpose under the Plan unless (a) the governing agreement by which HP acquired the organization specifically so provides, or (b) HP (or its delegate) amends this Plan to provide for such service-crediting.

3.    Eligibility And Participation

(a) Eligibility. An Employee is eligible to participate in this Plan if he or she is designated in writing (which may include an electronic notice) by HP as being subject to a workforce reduction action, and as eligible to participate in this Plan. The notification provided by HP shall indicate the date on which the Employee is to become a Participant.

(b) Participation. A Designated Employee shall become a Participant in the Plan on the date so indicated in writing by HP if he remains an active Employee and does not incur a voluntary or misconduct termination of employment on or before that date.

(c) Misconduct Termination. If a Designated Employee or Participant is terminated by reason of misconduct according to HP policy, his participation under this Plan shall cease and no further benefits shall be payable from this Plan with respect to such Employee.

4.    Workforce Redeployment Program Period

(a) Entry into Workforce Redeployment Period. A Participant who enters the Workforce Redeployment Program period of the Plan shall remain an active Employee in his current employment position at his current salary grade, and he shall continue to participate in HP's employee benefit plans on the same terms and conditions as in effect for all other similarly situated active Employees. The Participant shall also actively seek a new employment position within HP and/or any HP affiliate. HP shall provide job search assistance with respect to the Participant's search for such internal position. Such assistance shall be provided to the extent and in a manner determined by HP.

(b) Acceptance of Job or Termination of Employment During Redeployment Period. If a Participant starts a new job with HP or an affiliate during his or her Redeployment Period, such Participant's participation in the Plan shall end effective as of the start date for such job.

If a Participant terminates employment with HP (or its affiliates) during his or her Redeployment Period, such Participant's participation in the Plan shall end effective as of the Participant's Termination Date, and such Participant shall not be eligible to receive any further benefits under this Plan.

5.    Job Search/Salary Continuation Pay Period

(a) Entry into Job Search/Salary Continuation Pay Period. If by the end of a Participant's Redeployment Period, a Participant has not terminated employment, and he has not received (or has received but declined) a job offer (including a Direct Assignment Offer) with HP or any Affiliate, the Participant shall enter the Job Search /Salary Continuation Pay Period of the Plan. A Participant shall not perform any services for HP during the Job Search/Salary Continuation Pay Period.

3

(b) Amount and Form of Salary Continuation Pay. Such Participant shall receive Salary Continuation Pay during each week of this Period consisting of Weekly Pay; provided, however, Weekly Pay for Employees working less than full-time shall be adjusted downward in accordance with HP's standard procedures. In addition, a Participant shall continue to participate in HP's employee benefit plans on the same terms as in effect for similarly situated active employees. Salary Continuation Pay shall be paid according to HP's normal payroll cycle.

(c) Termination During or at Completion of Salary Continuation Pay Period. If a Participant starts a new job with HP or an HP Affiliate during his or her Job Search/Salary Continuation Period, then the Participant's Job Search/Salary Continuation Period shall end effective as of the Participant's start date for such job. Such Participant shall be entitled to Salary Continuation Pay and associated benefits for the time period from the beginning of his Job Search/Salary Continuation Period through the start date for the new job.

If a Participant terminates his employment with HP prior to the completion of his Job Search/Salary Continuation Period, then the Participant's Job Search/Salary Continuation Period shall end effective as of the Participant's Termination Date. Such Participant shall be entitled to Salary Continuation Pay and associated benefits for the time period from the beginning of his Job Search/Salary Continuation Period through his Termination Date.

A Participant who does not have a termination of employment on or before the end of the Salary Continuation Pay Period shall have a Termination Date as of the end of this Period.

(d) Career Transition Counseling. A Participant shall be eligible to receive career transition counseling for the three month period immediately following the date the Participant's Job Search/Salary Continuation Period begins. A Participant must register for such counseling within 30 days after the start of his Job Search/Salary Continuation Period, and must commence career transition counseling within 60 days after the start of his Job Search/Salary Continuation Period.

(e) Non-Duplication of Benefits. Salary Continuation Pay and associated benefits shall be received by a Participant with respect to the Job Search/Salary Continuation Period shall be in lieu of (and not in addition to) any other pay and benefits, and no Participant shall be entitled to a duplication of pay and/or benefits. The Salary Continuation Pay and associated benefits provided under this Plan are intended to satisfy the requirements of the WARN Act, and Salary Continuation Pay and associated benefits provided with respect to the Job Search/Salary Continuation Period shall constitute pay in lieu of notice for the purpose of satisfying any liability that HP may have under the WARN Act.

6.      Cash Severance Benefits

(a) Participants Eligible For A Cash Severance Payment.

1.      A Participant whose Termination Date is the last day of the Salary Continuation Pay Period shall be eligible to receive a Cash Severance Payment, unless determined to be ineligible for such Payment under this Section.

2.      A Participant whose Termination Date occurs before the last day of the Salary Continuation Pay Period because the Participant accepted a job with a competitor of HP (or an HP Affiliate) shall be eligible to receive a Cash Severance Payment, so long as the Participant notified his manager promptly upon acceptance of such position with the competitor.

(b) Participants Not Eligible for a Cash Severance Payment.

1.      A Participant who declined to accept a Direct Assignment Offer during the Salary Continuation Pay Period shall not be eligible to receive a Cash Severance Payment if such Direct

4

Assignment Offer was located within 50 miles of the Participant's then-current work location and within two salary grades of the Participant's then-current salary grade.

   2.     A Participant who accepted a job offer with a competitor and did not promptly notify his management about such job shall be eligible to receive a Cash Severance Payment.

   3.     A Participant who is terminated for misconduct at any time after becoming a Participant in the Plan shall not be eligible to receive a Cash Severance Payment, and shall only be eligible to receive Salary Continuation Pay (if any) through his Termination Date.

   (c)  Amount of Cash Severance Payment.  The Cash Severance Payment shall equal Weekly Base Pay multiplied by Years of Full-Time Equivalent Service, both determined as of the Participant's Termination Date, reduced by any and all Salary Continuation Pay paid or payable to a Participant with respect to the Job Search/Salary Continuation Period, except that the minimum Cash Severance Payment shall equal three times Monthly Base Pay, and the maximum Cash Severance Payment shall equal nine times Monthly Base Pay.

   (d)  Release Required.  A Participant's receipt of a Cash Severance Payment under this Plan is conditioned upon the Participant signing and not revoking (during the application revocation period) the Release required by HP.

   (e)  Form and Time of Payment.  Cash Severance Payments shall be made as soon as administratively practicable following expiration of the revocation period during which the Participant may revoke his acceptance of the Release. All payments shall be reduced by all applicable payroll withholdings. If a terminating Employee is indebted to HP or its affiliates at his or her Termination Date, then HP reserves the right to offset any Cash Severance Payment under the Plan by the amount of such indebtedness to the extent permitted by law.

   (f)  Retiree Medical Plan Eligibility for Certain Participants.  A Participant who would be eligible for an HP retiree medical benefit program within 365 days of his or her Termination Date, shall be eligible upon his Termination Date for benefits under that program. Premiums for retiree coverage, time of payment, and other plan provisions will be as for any other eligible retiree. In addition, if a Participant would have gained access to HP credits to his or her Retirement Medical Savings Account ("RMSA"), if any, within 365 days of his or her Termination Date, then, upon his or her Termination Date, HP credits to his or her RMSA will be available for reimbursement of eligible medical expenses.

   (g)  Other Benefits.  HP may provide Participants such other benefit, as HP may determine from time to time. Other benefits may include, without limitation, outplacement programs, educational assistance, financial counseling, time off for job search, or voluntary time off. Participants will be informed of such other benefits in the information provided with respect to each offering of benefits made under this Plan.

7.     **Payment of Benefits, Funding Policy**

   The benefits of this Plan shall be paid solely from the general assets of HP.  No contributions are required from or permitted by any Participant.

   HP is under no obligation to fund the benefits provided herein, but if it chooses to do so, any assets that HP may set aside shall not cause this to be a funded plan within the meaning of ERISA.

8.     **Claims and Appeal Procedure**

   (a)  Claim for Benefits.  If an individual or his or her authorized representative (the "Claimant") believes that he or she is incorrectly denied a benefit or entitled to a greater benefit

5

under the Plan than he or she received, then the Claimant must submit a written claim to HP at the address indicated in the summary plan description ("SPD").

(b) Time for Review. The Claimant shall be notified of the Plan Administrator's decision within 90 days after receipt of the claim by the Plan, unless the Plan Administrator determines that special circumstances require an extension for processing the claim. If an extension is required, notice shall be furnished to the Claimant before termination of the initial 90-day period. Such notice shall indicate the special circumstances requiring the extension, and the date by which the Plan expects to render its decision on the claim. In no event shall such extension exceed a period of 180 days after the date the claim is received by the Plan.

(c) Denial of Claim. If the Claimant's initial claim under this Section is denied, in whole or in part, the Plan Administrator, shall provide the Claimant with written or electronic notification of such denial. Such notice shall set forth  (i) the specific reason(s) for the denial, (ii) specific reference to the Plan provision(s) on which the denial is based, (iii) a description of any additional material or information necessary for the Claimant to perfect his or her claim and an explanation of why such additional material or information is necessary, and (iv) a description of the Plan's review procedures and the time limits applicable to such procedures.

(d) Right to Appeal.  A Claimant whose initial claim has been denied may appeal the denial by submitting written comments, documents, records and other information relating to the claim for benefits to the Appeals Committee within 60 days after receiving notice from HP of the denial of a claim. The reviewing committee shall provide the Claimant, upon request and free of charge, with reasonable access to and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits (other than that which is legally-privileged).  The request for review shall set forth all of the grounds upon which it is based, all facts in support thereof and any other matters which the Claimant deems pertinent. The reviewing committee may require the Claimant to submit such additional facts, documents or other material as he or she or it may deem necessary in making its review. The period for making the benefit determination on review shall be tolled from the date on which the request for additional items is sent to the Claimant until the date on which the Claimant responds to such request.

(e) Timing of Decision on Appeal. The reviewing committee shall act upon any request for review within 60 days after receipt thereof, unless special circumstances require an extension of time for review. If an extension of time for review is required, notice shall be furnished to the Claimant prior to the end of the initial 60-day period, indicating the special circumstances requiring an extension, and the date by which the committee expects to render its decision. In no event shall the decision of the reviewing committee be rendered more than 120 days after it receives the request for review. Notwithstanding the foregoing, if the reviewing committee constitutes a committee, then the time period may be as determined under ERISA Regulation Section 2560.503-1(i)(1)(ii).

(f) Decision on Review.  The reviewing committee shall give notice of its decision on review to the Claimant within the applicable time period.  If it is determined on review that benefits are payable under the Plan, HP will promptly establish the Claimant as a Participant and provide benefits as soon as administratively practicable thereafter.  In the event that the reviewing committee confirms the denial of the claim, in whole or in part, the committee will provide the Claimant with written notice that sets forth:  (i) the specific reason(s) for the denial, (ii) specific reference to the Plan provision(s) on which the denial is based, (iii) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information (other than that which is legally privileged) relevant to the Claimant's claim for benefits, and (iv) a statement of the Claimant's right to bring an action under ERISA Section 502(a).

(g) Limitation of Time Period for Bringing Action.  No action in law or equity shall be brought under this Plan until exhaustion of the claims and appeal sprocess described in Section 8. In addition, no legal or equitable action may he brought any later than (a) one year after the date

6

that the reviewing committee communicated the adverse benefit determination on appeal, or (b) two years after the facts giving rise to the legal or equitable action occurred.

9.      **Administration of the Plan; Amendment and Termination**

(a) Plan Sponsor and Plan Administrator. HP is the sponsor of the Plan, and the HP Plan Committee (the "Committee") is the "plan administrator" for purposes of ERISA. The Committee has full discretionary authority to control and manage the operation and administration of the Plan and to take any and all action it deems advisable, in its sole discretion, including, without limitation, the authority of the Committee as set out in its charter. In addition, HP has sole discretion to determine elements of employment with respect to any Employee or Designated Employee, including, without limitation, all elements of eligible pay and Participant termination date. All determinations made by HP and the Committee in their respective capacities shall be final and conclusive upon all persons.

(b) Amendment And Termination Of The Plan. HP may amend and terminate the Plan at any time for any reason. In the event of an conflict between this Plan document and the summary plan description or any documents containing information about the Plan, the terms of this Plan will control.

10.     **General Provisions**

(a) Choice of Law. This Plan shall be interpreted and construed in accordance with law of the State of Delaware, to the extent not preempted by ERISA.

(b) Assignment. No benefit paid or payable under this Plan shall be subject to assignment or alienation, and any attempt to do so shall be null and void. Notwithstanding the foregoing, HP may withhold from any amounts payable under this Plan such amounts as are necessary or appropriate to be withheld under applicable law or regulation.

(c) Death Benefit and Beneficiary. If a Participant dies before receipt of benefits that he was entitled to, then any remaining benefits will be paid to the beneficiary named (or deemed named) under his HP-provided life insurance.

(d) Competency to Handle Benefits. If any Participant or beneficiary appears to be unable to properly handle any property distributable to him under the Plan, the Administrator may make any reasonable arrangement for the distribution of Plan benefits on such person's behalf as it deems appropriate, and payment pursuant to such arrangements shall release HP from all further liability to the extent of the payment made.

(e) No Right to Employment. The establishment of the Plan, the granting of the benefits, and any action of HP or any other person shall not be held or construed to confer upon any person any right to be continued or rehired as an Employee or in any other capacity. No provision of the Plan shall restrict the right of HP or its affiliates to discharge any employee at any time, with or without cause.

(f) Unemployment Compensation. Nothing contained in this Plan shall entitle nor disentitle a Participant to unemployment compensation under the laws of the jurisdiction in which the Participant terminates employment. The determination of whether a Participant is entitled to unemployment compensation shall be made solely by the state agency with jurisdiction for making such determinations in each case.

(g) Severability of Provisions. If any provision of the Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, and the Plan shall be construed and enforced as if such provision had not been included.

7

(h) WARN Act Coverage. The benefits provided under this Plan are intended to satisfy any and all statutory obligations that may arise out of a Participant's employment loss including, without limitation, the obligations under the WARN Act. The Plan shall be construed and interpreted to comply with such intention. In the event that an Employee's employment loss is deemed covered by the WARN Act and payments under this Plan are deemed not to satisfy the requirements of the WARN Act, the benefit payable under the Plan (including without limitation, the Salary Continuation Pay and associated benefits, and the Cash Severance Payment) shall be reduced (but not below zero) by an amount equal to 60 days of pay (or less, if required to meet the requirements of the WARN Act).

(i) No Pension Payments; Effect of Code Section 409A. This Plan is intended to be an employee welfare benefit plan within the meaning of ERISA Section 3(1) and Section 2510.3-1 of the regulations issued thereunder, as the total of all payments will in no event exceed two times the Participant's annual compensation during the year immediately preceding his or her termination; and all payments under the Plan shall be completed within 24 months of the Participant's Termination Date.

In addition, benefits under the Plan are not intended to be covered by Section 409A of the Internal Revenue Code of 1986, as amended, as the Plan is intended to constitute an exempt severance plan under regulations issued under Section 409A.

(j) Unknown Whereabouts. It shall be the duty of each Participant to inform HP of his or her current mailing address. If a Participant fails to inform HP of his or her current mailing address, HP shall not be responsible for any late payment, loss of benefits, or failure of any notice to be provided in a timely manner.

(k) Separate Agreements. The provisions under this Plan will apply to an Employee who is entitled to receive severance benefits under a managed services or other transactional agreement (including agreements pursuant to a merger, acquisition, asset purchase, outsourcing, or joint venture) in the same manner as these provisions apply to an Employee otherwise receiving benefits under this Plan, except that such Employees shall not be eligible for Salary Continuation Pay, and the benefit formula with respect to the amount of the Cash Severance Payment payable to that Employee will be determined by the separate agreement, while other provisions under this Plan, including the claims, appeals and limitations on action provisions, will continue to apply.

(l) Non-Duplication of Benefits. Notwithstanding any contrary provision in the Plan, an Employee shall not be eligible for benefits under this Plan if the Administrator determines that in connection with a change in control or transaction between the Employee's previous employer and HP (including a merger, acquisition, asset purchase, outsourcing, joint venture, or any other form of business combination), the Employee received or will receive severance, salary continuation, pay in lieu of notice, and/or similar benefits from the Empoyee's previous employer or from HP.

8

The Plan is hereby amended and restated, effective as of September 1, 2007, and is hereby executed this 30 day of August, 2007.

HEWLETT-PACKARD COMPANY

By: _____

Marcela Perez de Alonso
Executive Vice President
Human Resources and
Workforce Development

9

Jan. 13 08 02:32p

*1) Notification letter*




EXHIBIT

**2**

Dear Employee:

You were previously notified in writing of your selection and released into the HP Redeployment Program, a program under the HP Workforce Reduction Plan (the "Plan"). The following enclosed documents are your legal documents under this plan:

### Summary Plan Description (SPD)
This document summarizes the basic terms of the Workforce Reduction Plan and is intended to describe the Plan in general terms. It is not intended to – and cannot – set forth every detail of the Plan. If there is any discrepancy between the SPD and the official Plan, the Plan will govern. It is important that you read this document, as it identifies certain situations in which you will not be eligible to receive a cash severance payment if you terminate from HP.

### Waiver and General Release Agreement (including instructions page)
This document is applicable to those employees released into the WFR Program and terminate under the guidelines of (the "Plan"). The Waiver and General Release Agreement must be signed and returned to the address given on the release form, unaltered for an impacted employee to be eligible for a severance payment. To be eligible to receive the lump sum severance payment, it is required that you sign and return your Waiver and General Release Agreement on or within 45 calendar days after your Termination Date, but no sooner.

### ADEA (if over forty)
Impacted employees over 40 years of age will also receive an attached ADEA enclosure. Please refer to paragraph eleven on your Waiver and General Release Agreement for additional information.

Please review all of the material enclosed. If after reviewing you still require additional information or answers to your questions, please feel free to email US HR Operations at WFM-USHROPS@hp.com. (Please be sure to include your employee number)

Regards,

Hewlett-Packard Company
US HR Operations

Jan 13 08 02:32p

P.3

*Waiver Release Agreement*

## INSTRUCTIONS FOR WAIVER AND GENERAL RELEASE AGREEMENT
### (For Use with HP's Workforce Reduction Plan)

To be eligible for the Cash Severance Payment provided for in the HP Workforce Reduction Plan (the "Plan"), you must complete and sign the attached Waiver and General Release Agreement ("Release Agreement") and send it by mail or overnight courier to the Hewlett-Packard HR Operations Organization. Once HP receives the Release Agreement and the seven-day revocation period has lapsed, the Cash Severance Payment will be processed and mailed to your home address on file with HP within 30 calendar days.

### Please do not sign or return this form until on or after your termination date.

1. Please print your name and employee number at the top of page 2.

2. In the introductory paragraph, print your full name in the space next to ("EMPLOYEE").

3. In Paragraph 1, insert your official termination date, as stated on your Redeployment Notification Letter, in the sentence that begins: "It is agreed that effective............"

4. If you are age 40 or over, the ADEA notice referenced in Paragraph 12 is attached.

5. You have 45 calendar days after your termination date to submit this form to the Hewlett-Packard HR Operations Organization. You may not sign or submit your Release Agreement any earlier than your termination date.

6. **Do not amend or alter the Release Agreement.** Release Agreements containing altered or amended terms and conditions will be rejected, and will result in your being entitled only to the salary continuation pay you received during your nine week job search/salary continuation period.

7. Please confirm that you have completed steps 1, 2, 3, signed your name and entered the date on the last page of the Release Agreement before mailing. An incomplete form may be returned to you, and this will delay processing of the Cash Severance Payment. Please make a copy of this Release Agreement and keep it for your records before submitting the original. You will not receive a signed copy back from HP.

**Submit the Release Agreement to:**
Hewlett-Packard HR Operations Organization
200 Forest Street
MRO1-3/K25
Marlboro, MA  01752
ATTN: HP Workforce Reduction Plan Administration Office

*Note:*
*The signed Release Agreement must be received by the Hewlett-Packard HR Operations Organization by 5 PM Pacific Time no later than 45 calendar days after your termination date.*

*You will not receive a confirmation that HP has received your Release Agreement. If a confirmation is important to you, then we recommend that you mail it certified with return receipt requested or by overnight courier so that you have a tracking number to refer to. HR Operations Organization and Payroll will not respond to phone calls to confirm your Release Agreement was received.*

ADL/22672.2/05-09-02

1

## WAIVER AND GENERAL RELEASE AGREEMENT
### (For Use with HP Workforce Reduction Plan)

**Employee Name:** _____

**Employee Number:** _____

This Waiver and General Release Agreement ("Agreement") is entered into between HEWLETT-PACKARD COMPANY (including its subsidiaries, affiliated companies, successors and assigns) ("HP") and _____ ("EMPLOYEE"). The purpose of this Agreement is to arrange a severance of the Employee's employment with HP on a basis that is satisfactory both to HP and to the Employee. The terms of the Agreement are:

1. It is acknowledged that Employee's employment by HP or any of its subsidiaries terminated on Employee's designated termination date _____.

2. Both the Employee and HP are entering into this Agreement as a way of concluding the employment relationship between them and settling voluntarily any dispute or potential dispute that the Employee has or might have with HP, whether known or unknown at this time. This Agreement is not, and should not be construed, as an allegation or admission on the part of either the Employee or HP that either has acted unlawfully or violated any state or federal law or regulation.

3. In return for the Employee's agreeing to the release that forms a part of this Agreement, HP agrees to provide the Employee the Cash Severance Payment and other benefits associated with the Hewlett-Packard Company Workforce Reduction Plan (the "Plan"). Any salary continuation pay received by or payable to Employee with respect to the job search/salary continuation period of up to nine weeks shall be offset against the amount due for the Cash Severance Payment, and a check or direct deposit for the balance will be issued within 30 days after this Agreement becomes effective. All payments and other benefits under this Agreement are subject to applicable employment and income taxes. The parties recognize that this payment exceeds any amounts to which the Employee would otherwise be entitled under existing HP policies or practices.

4. The exercise of any stock options shall continue to be subject to the terms and conditions of the stock option plan(s) and agreements pursuant to which such options were issued, including any modification to the treatment of such stock options in the event of termination under a workforce reduction plan provided by the HP Board of Directors (or its delegate), from time to time. Regardless of whether those plans, agreements or actions of the HP Board (or its delegate) provide Employee

with the opportunity to exercise options following termination of employment, Employee shall be solely responsible for tracking option expiration dates.

5.  In return for this payment and other benefits, Employee, for himself or herself, and his or her spouse, heirs, executors, representatives and assigns, forever releases, discharges, and agrees to hold harmless HP and its subsidiaries and affiliated companies and their respective shareholders, directors, officers, managers, agents, employees, attorneys, representatives and assigns from any and all claims, actions and causes of action arising at any time through the date of this Agreement. Such potential claims **include but are not limited to:**

5.1. any claims relating to employment discrimination or harassment based on race, color, sex, age, national origin, religion, disability, pregnancy, sexual orientation or otherwise, whether or not arising under Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, the Age Discrimination in Employment Act ("ADEA"), the Rehabilitation Act of 1973, the Americans With Disabilities Act, the Older Workers Benefit Protection Act, the California Fair Employment and Housing Act, any amendments to the foregoing, or any other federal, state, local or foreign law, statute, regulation or order relating to employment discrimination;

5.2. any claims relating to pay, benefits or leaves of absence, whether or not arising under the Family and Medical Leave Act, the Employee Retirement Income Security Act, the Worker Adjustment and Retraining Notification Act or any similar laws enacted in any jurisdiction;

5.3. any "wrongful termination" claims, and any other claims relating to employment or termination of employment by HP, whether or not based upon any oral, written, express or implied employment contract or agreement; any implied covenant of good faith and fair dealing; any alleged violation of public policy; compliance (or lack of compliance) with any HP policy, procedure, practice, or guideline;;; or any federal, state, local or foreign law, statute, regulation or order, whether or not relating to labor or employment;

5.4. any claims alleging wrongful acts resulting in physical injury, emotional distress, damage to reputation or any other damage;

5.5. any claim for attorneys' fees or costs; and

5.6. any claims relating to any other matter or event occurring prior to the execution of this Agreement whether or not brought before any judicial, administrative or other tribunal.

6.  The claims released pursuant to this Agreement include all claims against individual employees or agents of HP or its subsidiaries whether acting within the scope of their duties, individually or in any other capacity. The claims released include all claims that may be brought on Employee's behalf by any person or agency as well as any class or representative action under which Employee may have any rights or benefits. This Agreement does not, and shall not be construed as an attempt to, waive or release any claim or right that cannot lawfully be waived or released by private agreement between Employee and HP.

7.  In entering into this Agreement, the parties intend it to be a full and final settlement of all matters, whether or not disputed at present that could have arisen between them. **Employee understands and expressly agrees that this Agreement extends to all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected; and accordingly Employee waives all rights under Section 1542 of the California Civil Code and/or any similar statute or law of any other jurisdiction.** Such section reads as follows:

    > Section 1542. A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

8.  Employee and HP fully understand that if the facts with respect to this Agreement are later found to be different from the facts now believed to be true, Employee and HP expressly accept and assume the risk of such possible differences of fact, and agree that this Agreement shall be and remain effective notwithstanding such differences. Employee agrees that the consideration set forth above fully compensates him or her for this risk, and that Employee will have no legal recourse against HP in the event of such differences.

9.  Employee represents that he/she does not have in his/her possession any specifications, drawings, sketches, notes, reports, proposals, computer disks, sales reports, customer lists, marketing or business plans, or copies of them, or other documents or materials, tools, equipment or other property belonging to HP. Employee acknowledges that during the course of employment with HP, he/she has had access to and acquired knowledge of trade secrets and confidential and proprietary business information relating to HP and/or third parties such as suppliers and customers. Employee agrees to maintain all such information in strict confidence and to abide by the terms of any confidentiality and/or proprietary information agreement that he/she has entered into with HP. Nothing in this

ADL/22672.2/05-09-02                          4

Agreement is intended to limit any remedy of HP under applicable law in connection with protection of its intellectual property.

10. Employee agrees that he/she will not make or publish, either orally or in writing, any disparaging statement regarding HP or in any way impede or interfere with HP's customer relationships.

11. Employee agrees to fully cooperate with and assist HP in resolving any and all claims, disputes or lawsuits involving HP during the course of Employee's employment.

12. For employees age 40 and over, the Older Workers Benefit Protection Act requires that HP provide Employee with the job titles and ages of all employees covered by this severance program within Employee's decisional or organizational unit, and the ages and job titles of all individuals in the same decisional or organizational unit who were not selected for the program. This information is set forth in the ADEA notice delivered with this Agreement.   Employee acknowledges receipt of this information.

12.1.1.   Employee acknowledges that he or she has had at least 45 calendar days to consider this Agreement before the date he/she is obligated to sign it.

12.2.   Employee agrees that he/she is aware of the contents and significance of all the provisions of this Agreement and that he/she has decided to enter into it voluntarily.

12.3.   Employee may revoke this Agreement within seven calendar days after this Agreement is signed.   Employee and HP agree that this Agreement shall not become effective or enforceable until this seven-day revocation period has ended.

12.4.   Employee acknowledges that he/she has the right to, and has been encouraged to, have this Agreement reviewed by counsel prior to signing it, and that he/she has had an opportunity to consult with counsel, if he/she chooses to do so;

12.5.   Employee understands that rights or claims under the Age Discrimination in Employment Act of 1967 (29 USC § 621 et seq.) that may arise after the date this Agreement is signed are not waived; and

12.6.   Employee understands that nothing in this Agreement shall be construed to prohibit Employee from filing a charge or complaint, including a challenge to the validity of this

Agreement, with the EEOC or participating in any investigation or proceeding conducted by the EEOC.

13. Employee understands and agrees that he or she has no right to be employed or retained by HP as an employee or contingent worker at any time in the future, and Employee shall not at any time institute or join in any claim or action against HP for failure to employ or retain him or her. HP may in its sole discretion consider engaging Employee as an employee or contingent worker in accordance with its policies regarding such matters, as in effect from time to time. Any engagement of Employee as an employee or contingent worker in violation of such policies shall be voidable at any time, at HP's option.

14. This Agreement shall be binding upon Employee and HP and upon their heirs, administrators, representatives, executors and assigns. Employee expressly warrants that he/she has not transferred to any person or entity any rights, causes of action or claims released in this Agreement.

15. This Agreement shall be interpreted in accordance with the plain meaning of its terms and not strictly for or against either HP or Employee. Should any provision of this Agreement be determined by any court to be wholly or partially invalid or unenforceable, the validity and enforceability of the remaining provisions shall not be affected, and the unenforceable or invalid provision shall be deemed not to be a part of this Agreement.

16. Both employee and HP understand and agree that, except for matters relating to intellectual property, trade secrets, confidential or proprietary information, this Agreement represents the entire agreement and understanding between them concerning Employee's separation from HP, and supersedes and replaces all prior and contemporaneous agreements and understandings concerning Employee's relationship with HP and compensation by HP. Employee shall continue to be bound by any agreements previously made with HP relating to intellectual property, trade secrets and confidential or proprietary information. This Agreement may only be amended in a writing signed by Employee and a President of HP.

17. This Agreement may be executed in counterparts or by facsimile, and each counterpart, facsimile or photocopy shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.

18. Employee may accept this Agreement by fully executing it and returning it no earlier than Employee's termination date and no later than 45 days following Employee's termination

ADL/22672.2/05-09-02                        6

date.  After executing this Agreement, Employee shall have seven days to revoke this Agreement by indicating his/her desire to do so in writing, addressed to HP, Attention: Workforce Management Programs, 200 Forest Street – MRO1-3/K25, Marlboro, MA 01752. The effective date of this Agreement shall be the eighth day following the Employee's signing of the Agreement.  If Employee does not accept this Agreement within the time period described above, or if Employee revokes this Agreement during the seven-day revocation period, this Agreement shall be null and void and HP shall have no obligation to make any payments or provide any benefits under the Plan.

IN SIGNING THIS AGREEMENT, THE EMPLOYEE FURTHER STATES THAT HE OR SHE HAS HAD THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF HIS OR HER CHOICE, THAT HE OR SHE HAS CAREFULLY READ THIS AGREEMENT, THAT HE OR SHE HAS HAD AMPLE TIME TO CONSIDER ITS CONSEQUENCES, THAT HE OR SHE FULLY UNDERSTANDS ITS FINAL AND BINDING EFFECT, THAT THE ONLY PROMISES MADE TO INDUCE HIM OR HER TO SIGN THIS AGREEMENT ARE THOSE STATED ABOVE, AND THAT HE OR SHE IS SIGNING THIS AGREEMENT VOLUNTARILY.

Employee Signature:                          Hewlett-Packard Company

_____                    By: _____

Printed Name: _____                Name: _____

Employee Number: _____                Title: _____

Mailing Address: _____                Date: _____

_____

Date: _____

NOTE:  This date can be no earlier than your termination date.

Highly Confidential - S-TSGA-DCS-ISS - Non Concepted ALL

ADEA – WFR Selected



HP   State: SLS-T6UA-OGS-ISS
     Job Group(s): ALL

- TO confidential -

ADEA - WFR Not Selected

ADEA SLS - T6UA-OGS - 05.xls